IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK A. CLARK,                          )
                                        )
                  Plaintiff,            )
                                        )
v.                                      )          Case No. 07-2072-JPO
                                        )
YELLOW TRANSPORTATION, INC.,            )
                                        )
                  Defendant.            )

## MEMORANDUM AND ORDER

### I.  Introduction

The plaintiff, Mark A. Clark, brings this race discrimination and retaliation case against the defendant, Yellow Transportation, Inc., under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*  This case is now before the court[1] on defendant's motion for summary judgment **(doc. 49)**.  The instant motion has been fully briefed (*see* docs. 50, 56, & 61).

### II.  Facts[2]

Defendant is a motor carrier engaged in the business of transporting freight.  Plaintiff, an African-American male, was hired by defendant on or about August 14, 2001 as an over-

---

[1] On September 28, 2007, by consent of both parties, this case was reassigned for disposition from Hon. John W. Lungstrum, U.S. District Judge, to the undersigned U.S. Magistrate Judge, James P. O'Hara (*see* doc. 22).

[2] The court, of course, construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant to Fed. R. Civ. P. 56.  Immaterial facts and those not properly supported by the record are omitted.  When necessary, additional facts are included in the analysis section of this memorandum and order.

the-road driver based out of Kansas City, Missouri.  He remains employed by defendant.

From April 1, 2003 through March 31, 2008, the terms and conditions of plaintiff's employment were governed by the National Master Freight Agreement and its Central Region Local Cartage and Over-The-Road Supplemental Agreement (collectively, the "CBA"), various memorandums of agreement by and between defendant and the International Brotherhood of Teamsters and its Local No. 41 (the "Union"), and the Sleeper Work Rules and Dispatch Procedures (the "Local Rules").

At the time in question in this case, plaintiff was a sleeper team driver, meaning he worked with a partner driving long distances for several days at a time.  Sleeper teams alternate driving responsibilities and sleep/rest time.  Under the Local Rules, sleeper teams earn time off based on the amount of consecutive miles driven, briefly summarized below:

> 3000 miles = 24 hours off
> 4000 miles = 48 hours off
> 5000 miles = 72 hours off

When a sleeper team returns from a run, the drivers are required to complete a "drop slip," which indicates the date and time they are available for reassignment on the "call block."  If a sleeper team has earned time off, the drivers are permitted to designate a call block consistent with the amount of time off the drivers have earned.  Drivers may not use earned time off on an individual basis, but rather must take it at the same time as their partners.  If a driver wants to use vacation or sick days, he or she is required to fill out a separate request form.  If a driver has not earned time off or requested vacation or sick days,

he or she is required to designate the earliest date and time he or she is available to drive subject to U.S. Department of Transportation hours of service regulations.

Defendant has many different runs, which vary in length.  Drivers are paid based upon run distances, in terms of mileage and hours.  The type of run (i.e., sleeper runs, single-man lay-down runs, single-man turn runs) and mileage dictate compensation.  Dispatchers make decisions regarding work assignments to drivers.

In 2004, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and subsequently received a notice of right to sue on that charge in 2005.  Plaintiff did not file a lawsuit based on the charge of discrimination within 90 days of receiving his notice of right to sue.

On October 25, 2005, Robert Cantu, an assistant linehaul manager for defendant, issued a written warning to plaintiff for "drop[ping] from the board for approximately 80 hours."  This warning indicated that "recurrence of this or similar type acts [would] result in further disciplinary action up to and including discharge."   On November 17, 2005, Mr. Cantu issued a second written warning to plaintiff for dropping "from the board for eighty-five (85) hours after running only 3360 miles."  This warning also indicated that "recurrence of this or similar type acts [would] result in further disciplinary action up to and including discharge." As a result of these letters, plaintiff did not receive a suspension, reduction in pay, or demotion.  Plaintiff admits these warnings were not inappropriately issued; however, many employees deposed indicated they had seen several other employees

get away with violating the same work rule more egregiously with no repercussions.

James Young, plaintiff's partner, testified that he saw a team of Caucasian drivers who drove one run and took off extra time as if they had driven 5000 to 6000 miles and were not disciplined. Mr. Young did not remember specifics but stated this happened more than once. Plaintiff testified that in February 2006 a Caucasian driver and his non-African-American partner[3] dropped five days after running less than 3000 miles. Plaintiff testified the drivers told him the additional time was not authorized by management.

Of the fourteen employees who are authorized to "issue discipline" at defendant's Booth facility, where plaintiff is based, twelve are Caucasian, one is African-American, and one, Mr. Cantu, is Hispanic. Four percent of the drivers at the Booth facility are African-American.

Although both of Mr. Cantu's above-described written warnings indicate plaintiff could be discharged if he did not change his behavior, defendant would be unable to terminate him in accordance with Article 46 of the CBA without just cause and unless at least one effective warning notice has been issued. Warning notices issued under Article 46 only remain in effect for nine months. They do, however, remain in an employee's personnel file. Both letters expired, pursuant to Article 46 of the CBA, by August 11, 2006 but, presumably, remain in plaintiff's employee personnel file.

---

[3] At his deposition, plaintiff was asked whether the partner was African-American but was not asked to identify his race.

Robert G. Morris, another over the road driver who has worked for defendant since 1991, testified that he has seen actions taken by defendant, such as termination, relating back to older charges of discipline, including for the accumulation of letters beyond the nine months.  Linda Giles, plaintiff's union steward, testified that although a warning letter for dropping off the board too long is minor, getting three such letters may result in a suspension. Alvin Schrepel, plaintiff's supervisor, testified that three minor violations in nine months could result in termination.

During the same general time frame that plaintiff received his two warning letters, from August 9, 2005 to November 11, 2005, defendant disciplined at least eighteen drivers, fourteen of which were Caucasian, for violation of the identical work rule prohibiting dropping off the board for more hours than the drivers earned, as summarized in the following chart.

| NAME | DATE | RACE | COMMENTS |
|---|---|---|---|
| Darryl Hawkins | 8/9/2005 | African-American | Discipline was rescinded after driver presented sufficient information indicating that it was not warranted. |
| Jeffery Holland | 8/9/2005 | African-American | Discipline was rescinded after driver presented sufficient information indicating that it was not warranted. |
| George Casey | 10/25/2005 | Caucasian | |
| Clyde Courtney | 10/25/2005 | Caucasian | |
| Mark Clark | 10/25/2005 | African-American | |
| James Young | 10/25/2005 | African-American | |
| Edward Orscheln | 11/4/2005 | Caucasian | Discipline was rescinded after driver presented sufficient information indicating that it was not warranted. |

| | | | |
|---|---|---|---|
| George Wolf | 11/4/2005 | Caucasian | |
| Loren Casteel | 11/4/2005 | Caucasian | |
| Clarence Pennington | 11/4/2005 | Caucasian | |
| Mark Degruson | 11/4/2005 | Caucasian | |
| Michael Hamblin | 11/4/2005 | Caucasian | |
| Michael A. Jackson | 11/4/2005 | Caucasian | |
| Kevin Epperson | 11/4/2005 | Caucasian | |
| Ronald Robertson | 11/4/2005 | Caucasian | |
| Gary Simoneau | 11/4/2005 | Caucasian | |
| Vernon Rust | 11/4/2005 | Caucasian | |
| Thomas Stephens | 11/4/2005 | Caucasian | |

**Second Warnings**

| | | | |
|---|---|---|---|
| Mark Clark | 11/17/2005 | | |
| James Young | 11/17/2005 | | |

On May 30, 2006, plaintiff filed a charge of discrimination with the EEOC.  In his May 30, 2006 charge, plaintiff alleged that defendant discriminated and retaliated against him because of his race from November 15, 2005 to November 22, 2005.  In this charge, plaintiff specifically alleged the following:

I.      I was hired by Respondent on or about 8/14/01.
II.     I was disciplined.
III.    I believe this was discrimination against me because of my race, black, and retaliation against me for opposing acts made unlawful by Title VII.

The discipline referred to in this charge involved the two warning letters plaintiff received in October and November 2005 for dropping off the driver call board for too long.  On November 21, 2006, the EEOC issued plaintiff a notice of right to sue on his May 30, 2006 charge.  Pursuant to this notice, plaintiff initiated this lawsuit on February 18, 2007 by filing a complaint that alleged unequal treatment and retaliation based upon his race in violation

of Title VII.

On November 26, 2007, plaintiff filed another charge of discrimination against defendant with the EEOC and the Kansas Human Rights Commission.  In his November 26, 2007 charge, plaintiff alleged defendant discriminated and retaliated against him because of his race from April 4, 2007 to September 10, 2007.  In this charge, plaintiff specifically alleged the following:

> I.   I was hired by Respondent on or about 8/14/01 and I currently hold a position as an Over the Road Driver.
> II.  I was affected by the termination of my co-driver for having an accident.  A white employee had a similar accident and was not disciplined.
> III. I was subjected to a racially offensive picture hanging near the time clock.
> IV.  I believe this is discrimination against me because of my race, black, and retaliation against me for opposing acts made unlawful by Title VII.

The first accident referred to in this charge occurred in July 2006 in Santa Fe, New Mexico, while plaintiff's partner, Mr. Young, was driving.  The specific adverse actions that plaintiff claims are connected to his co-driver's accident are: (1) plaintiff was paid a "single driver" rate, as opposed to a "sleeper team" rate, because he had to drive back to Kansas City by himself when his partner was taken out of service because of the accident; (2) he believes he should have been compensated for ten hours of rest he had to take during the trip pursuant to federal regulations; and (3) he believes he should not have been dispatched from Santa Fe, New Mexico to Albuquerque, New Mexico immediately after the accident because he did not believe he could legally drive at the time.  None of these alleged actions occurred during

the relevant time period between April 4, 2007 and September 10, 2007.  As a result of this accident, Mr. Young was immediately relieved of duty and flown home.  He was subsequently terminated but regained employment with defendant after nine days.  Mr. Young continues to work for defendant.

Although not specifically indicated in his November 26, 2007 charge, plaintiff alleges defendant discriminated and retaliated against him by failing to assign him longer, more financially rewarding trip runs, presumably as a result of his partner's brief termination.  However, Mr. Schrepel, plaintiff's supervisor, was unaware of any specific request by plaintiff for longer runs or that requests by plaintiff for longer runs were being constantly denied.  He was also unaware that plaintiff complained to management about a double standard involving the assignment of runs.  Mr. Morris, when asked if he was aware of any African-American drivers complaining about not being given longer runs, replied that every driver has that complaint.

After Mr. Young and plaintiff's accident, a Caucasian team had an accident in April 2007 under similar conditions (i.e., high winds, rain, no highway shoulder) near the same location.  The Caucasian team, instead of being ordered to return to Kansas City, was sent to Albuquerque, New Mexico and given a set of empty trailers to take to San Bernardino, California.  The Caucasian team was never relieved of duty, suspended, given a letter of investigation, disciplined, or terminated as a result of this accident.

On February 11, 2008, the EEOC issued plaintiff a notice of right to sue on his

November 26, 2007 charge.  On February 22, 2008, plaintiff filed a motion to amend his February 18, 2007 complaint to add additional claims of discrimination and retaliation contained in his November 26, 2007 charge (doc. 35).  On April 21, 2008, the court, granting the motion in part and denying it in part, ordered that plaintiff was precluded from adding any claims of discrimination or retaliation unless the actions occurred between April 4, 2007 and September 10, 2007—the dates recorded in his November 26, 2007 charge (*see* doc. 37). The court ordered these claims could relate to his co-driver's July 2006 accident and termination, but the actions themselves had to occur between April 4, 2007 and September 10, 2007 to be considered timely.  The court denied plaintiff's motion to amend his complaint to add a racial harassment claim based on a racially offensive picture hanging near the time clock, a claim based on racial comments made in the workplace, a claim of harassment by plaintiff's supervisor, and a hostile work environment claim.

Pursuant to the court's April 21, 2008 order, and as admitted by plaintiff, plaintiff's only remaining claims are: (1) he was discriminated and/or retaliated against by the issuance of the two 2005 warning letters; and (2) he was discriminated and/or retaliated against as a result of his co-driver's accident and termination, but only to the extent the discriminatory/retaliatory acts occurred between April 4, 2007 and September 10, 2007.

### III.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates there is "no

genuine issue as to any material fact," and it is "entitled to a judgment as a matter of law."[4]

In applying this standard, the court views the evidence and all reasonable inferences

therefrom in the light most favorable to the nonmoving party.[5]  A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  An

issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier

of fact could resolve the issue either way."[7]

The moving party bears the initial burden of demonstrating an absence of a genuine

issue of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet

that standard, a movant that does not bear the ultimate burden of persuasion at trial need not

negate the other party's claim; rather, the movant need simply point out to the court a lack

of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met his initial burden, the burden shifts to the nonmoving party

to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving

party may not simply rest upon his pleadings.[11]  Rather, the nonmoving party must "set forth

---

[4] Fed. R. Civ. P. 56(c).

[5] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[6] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Id.* (citing *Anderson*, 477 U.S. at 248).

[8] *Id.* at 670–71.

[9] *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[10] *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment).

[11] *Anderson*, 477 U.S. at 256.

specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]   "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[14]

## IV.   Analysis

A.   Plaintiff's Exhaustion of Administrative Remedies

It is well established that "Title VII requires a plaintiff to exhaust his or her administrative remedies before filing suit."[15]   In a deferral state, such as Kansas, a plaintiff must file his claim with the EEOC within 300 days of the alleged unlawful act.[16]   A plaintiff who fails to timely raise a discrimination claim before the EEOC is precluded from raising that same claim in court.[17]   The exhaustion of administrative remedies serves "to put an

---

[12] *Adler*, 144 F.3d at 671.

[13] *Id.*

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005); *see also Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996); *Ingels v. Thiokol Corp.*, 42 F.3d 616, 624–25 (10th Cir. 1994).

[16]   42 U.S.C. § 2000e-5(e); *Hernandez v. Data Sys. Int'l, Inc.*, 266 F. Supp. 2d 1285, 1295 (D. Kan. 2003) (citing *Peterson v. City of Wichita, Kan.*, 88 F.2d 1307, 1308 (10th Cir. 1989)).

[17] *Williams v. Rice*, 983 F.2d 177, 180 (10th Cir. 1993).

employer on notice of a violation prior to the commencement of judicial proceedings. This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation."[18]

"After a plaintiff has complied with this administrative requirement, he may file suit."[19] Unlike many other circuits, the Tenth Circuit has "held that a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under Title VII—not merely a condition precedent to suit."[20] The Supreme Court recently abrogated the continuing violation doctrine "as previously applied to claims of discriminatory or retaliatory actions by employers, and replace[d] it with the teaching that each discrete incident of such treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted."[21]

> The suit may include allegations of discrimination reasonably related to the allegations listed in the administrative charge, including new acts occurring during the pendency of the administrative charge. But courts will disregard allegations not reasonably related to the listed allegations; to allow consideration would circumvent the administrative agency's investigatory and conciliatory role as well as deprive the charged party [of] notice of the charge. [B]ecause failure to exhaust administrative remedies is a bar to subject matter jurisdiction,

---

[18] *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832–35 (1976)).

[19] *Alston v. U-Haul Co. of Kan., Inc.*, No. 06-2403, 2007 WL 1412672, at *1 (D. Kan. May 10, 2007).

[20] *Shikles*, 426 F.3d at 1317 (citing *Jones*, 91 F.3d at 1399 n.1).

[21] *Martinez*, 347 F.3d at 1210 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–13 (2002)).

the burden is on the plaintiff as the party seeking federal jurisdiction to show by competent evidence that []he did exhaust.[22]

In his May 30, 2006 charge, plaintiff alleged defendant discriminated and retaliated against him because of his race from November 15, 2005 to November 22, 2005. While plaintiff argues that both of his warning letters constituted the discipline referred to in his charge, the dates listed in the charge do not encompass the October 25, 2005 warning letter. The court, giving plaintiff some leeway, finds the October 25, 2005 warning letter is reasonably related to the November 17, 2005 second warning letter because it was, in essence, his second warning as a result of his allegedly unchanged behavior after the October warning issued only about three weeks earlier. The court therefore has jurisdiction over matters concerning both warning letters.

In its April 21, 2008 order, the court ruled that plaintiff was precluded from asserting any claims related to discriminatory or retaliatory actions allegedly taken by defendant against plaintiff related to the July 2006 accident prior to April 4, 2007—the date which plaintiff alleged the acts of discrimination began in his November 26, 2007 charge. However, the court also ruled that plaintiff was not precluded from asserting claims related to discriminatory or retaliatory actions allegedly taken by defendant against plaintiff even if the acts were related to the July 2006 accident, *provided* the acts themselves occurred

---

[22] *Alston*, 2007 WL 1412672, at *1 (internal quotations and citations omitted).

between April 4, 2007 and September 10, 2007.[23]

In an attempt to argue the court has jurisdiction over the repercussions he suffered immediately after his July 2006 accident, plaintiff argues he was unaware the accident repercussions were discriminatory until after the Caucasian team's accident and the discriminatory acts therefore actually occurred in April 2007.  Defendant argues the accident repercussions occurred in July 2006 and are therefore not covered by plaintiff's November 26, 2007 EEOC charge.

The court rejects plaintiff's argument that the accident repercussions did not occur under the statute until April 2007.  Under Title VII, "[a] charge . . . shall be filed within [300] days after the alleged unlawful employment practice *occurred*."[24]  The Supreme Court has clearly stated that "[a] discrete retaliatory or discriminatory act 'occurred' on the day it 'happened.'  A party, therefore must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it."[25]  The repercussions plaintiff suffered directly after the July 2006 accident happened in July 2006, and therefore plaintiff's 300-day window in which to file a charge began in July 2006.

Although not explicitly argued by plaintiff, the court will address whether a so-called "discovery rule" applies to alleged violations of Title VII.  That is, as earlier indicated, plaintiff argues he did not discover the actions were discriminatory until April 2007, when

---

[23] *See* doc. 37, at 6.
[24] 42 U.S.C. § 2000e-5(e)(1) (emphasis added).
[25] *Morgan*, 536 U.S. at 110.

the Caucasian drivers had a similar accident.  The court will therefore analyze whether plaintiff's discrimination action first accrued in April 2007 when he learned the actions were possible Title VII violations.

In *Hulsey v. Kmart, Inc.*, the Tenth Circuit held that a cause of action under the Age Discrimination in Employment Act ("ADEA") accrues "on the date an employee is notified of an adverse employment decision," such as when an employer announces a particular event or decision.[26]  The employees in *Hulsey* argued they did not suspect their demotions and transfers were motivated by discrimination until viewing a television program two years later and their causes of action accrued when they viewed the program.[27]  The court rejected the employees' argument and held their causes of action accrued on the dates their employer notified them of their new assignments.[28]

In *Bennett v. Coors Brewing Co.*, the former employees argued that their discrimination claims under the ADEA did not arise until the date the employer hired its first replacement employee.[29]  The Tenth Circuit held that "[w]hile the hiring of new, younger employees might be evidence of [the employer's] alleged discriminatory intent at the time [the plaintiffs] left [the employer], it is the alleged discriminatory 'discharge' that [the plaintiffs] seek to redress."[30]  The Tenth Circuit therefore held that the latest date the

---

[26] 43 F.3d 555, 557 (10th Cir. 1994).

[27] *Id.*

[28] *Id.*

[29] 189 F.3d 1221, 1234 (10th Cir. 1999).

[30] *Id.* at 1235.

plaintiffs' constructive discharge claims could be considered to have arisen was when plaintiffs' official employment ended.[31]

Notice or knowledge of an employer's discriminatory motivation is not a prerequisite for a cause of action to accrue.[32]  Rather, it is knowledge of the adverse employment decision itself that triggers the running of the 300-day period.[33]  A claimant need not know all the evidence upon which he will rely at trial in order to file a charge with the EEOC.  One purpose of a charge is to uncover facts, and it is sufficient that a plaintiff is on notice at the time of the alleged adverse action to inquire whether there was a discriminatory motive for the action.[34]

Although defendant's treatment of the Caucasian drivers after their April 2007 accident might be evidence of its alleged discriminatory motive at the time of plaintiff's accident, it is the repercussions plaintiff suffered directly after his July 2006 accident that he seeks to redress.  Plaintiff  learned of the repercussions in July 2006 when they occurred. Therefore, July 2006 is the date when plaintiff's claim related to the repercussion he suffered in July 2006 began to accrue.

Plaintiff has not expressly argued that the equitable tolling doctrine applies to this case.  The court will nevertheless address the issue.  It is well settled that the "time period

---

[31] *Id.* at 1226, 1235.
[32] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003) (quoting *Hulsey*, 43 F.3d at 558-59).
[33] *Id.* (quoting *Hulsey*, 43 F.3d at 558-59).
[34] *Id.* at 1188.

for filing a charge is subject to equitable doctrines such as tolling or estoppel."[35]  Equitable tolling and equitable estoppel provide "for tolling of the statute of limitations when a plaintiff's unawareness of his ability to bring a claim—either unawareness of the facts necessary to support a discrimination charge or unawareness of his legal rights—is due to defendant's misconduct."[36]  However, these doctrines are applied sparingly.[37]

The time limits set forth in Title VII "will be tolled *only* if there has been 'active deception' of the claimant regarding procedural prerequisites."[38]  An employer giving a non-discriminatory reason for an adverse action does not constitute active deception.[39]  Further, "[e]quitable tolling is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose."[40]

Here, plaintiff has not alleged defendant actively deceived him regarding the actions taken directly after his July 2006 accident or the procedural prerequisites for him to assert

---

[35]  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[36]  *Bennett*, 189 F.3d at 1235.

[37]  *Morgan*, 536 U.S. at 109.

[38]  *Mascheroni v. Bd. of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1562 (10th Cir. 1994) (quoting *Sheerer v. Rose State College*, 950 F.2d 661, 665 (10th Cir. 1991), *cert. denied*, 505 U.S. 1205 (1992)); *see also Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1271 (D. Kan. 2002) (declining to toll the limitations period where there was no evidence the employer intended to delay the employee's filing of an EEOC charge or otherwise engaged in conduct it should have unmistakably understood would cause the employee to delay filing a charge).

[39]  *Davis v. Wesley Ret. Cmtys, Inc.*, 913 F. Supp. 1437, 1443 (D. Kan. 1995).

[40]  *Bennett*, 189 F.3d at 1235 (internal quotation omitted).

a claim.  Further, plaintiff has not presented evidence of such deception by defendant. Therefore, because there is no evidence of "active deception" on the part of defendant, the equitable tolling doctrine does not apply in this case.

Plaintiff failed to file an administrative charge regarding the July 2006 accident within 300 days of the accident (the charge was not filed until approximately 500 days later). Plaintiff has failed to exhaust his administrative remedies regarding any repercussions he suffered directly after the July 2006 accident.  Therefore, the court grants defendant's motion for summary judgment regarding the alleged adverse employment actions that occurred directly after the July 2006 accident, including plaintiff being paid the single driver rate instead of the sleeper driver rate, being asked to take unpaid rest for ten hours, and being dispatched to Albuquerque, New Mexico.

Plaintiff also has failed to provide evidence of discrete discriminatory or retaliatory acts against *him* that occurred during the  relevant time period.  He suffered from no adverse employment action during the relevant time period—all the adverse actions he claims occurred directly after the July 2006 accident.  He suffered no direct harm as a result of the Caucasian drivers' accident in April 2007.  Plaintiff's claim that, as a result of his co-driver's accident, he was no longer assigned "longer and more financially rewarding trip runs" is reasonably related to plaintiff's claim in the November 26, 2007 charge that he was affected by the termination of his co-driver for having an accident.  Plaintiff only has exhausted his administrative remedies for the time period from April 4, 2007 to September 10, 2007, and

the court only has subject matter jurisdiction regarding acts of discrimination and retaliation that allegedly occurred during that time period.

Plaintiff, however, has failed to provide facts regarding *any* discrete instances of being denied longer runs during the time period of April 4, 2007 to September 10, 2007.  His supervisor has no recollection of plaintiff complaining about not being assigned longer runs. Because plaintiff has failed to provide specific facts to support his allegations, he has not met his burden of proof to survive summary judgment.  As a result, the court grants defendant's motion for summary judgment regarding plaintiff's claim he was not assigned  "longer and more financially rewarding trip runs" from April 4, 2007 to September 10, 2007.

Plaintiff's other allegations are so vague that it is impossible to determine if they are reasonably related to the allegations he made in his EEOC charges.  For example, some of his allegations include:

(1)     Adverse employment actions were committed by defendant against plaintiff;

(2)     Plaintiff was discriminated against because he was not paid for work directed by defendant that he perform;

(3)     Plaintiff was discriminated against because he was disciplined for actions he took that were directed by defendant;

(4)     Unfair pay on contract issues and promotion practices;

(5)     Unequal terms and conditions of employment.

The record is such that the court cannot determine the specific details of these vague

allegations to adequately determine which allegations would fall under its jurisdiction. Plaintiff also claims he was discriminated and/or retaliated against with regard to a May 11, 2007 warning letter pertaining to an April 11, 2007 incident and that he was not paid for miles he drove on April 11, 2007.   Plaintiff's claim, which is also vague, does not appear reasonably related to his November 26, 2007 charge that alleged he was affected by the terminated of his partner.   The court therefore finds that even if it had been properly pleaded, the court does not have jurisdiction over the May 11, 2007 warning letter.

Further, plaintiff did not even attempt to establish prima facie cases of discrimination or retaliation as to any alleged adverse employment action besides the two 2005 warning letters and the accident repercussions directly after his partner's April 2006 accident, over which the court does not have jurisdiction.   As a result, the court finds it only has jurisdiction over matters that are reasonably related to the two warning letters issued in 2005.

B.     Plaintiff's Discrimination Claims

Plaintiff claims defendant discriminated and retaliated against him on the basis of his race in violation of Title VII.   As plaintiff has not provided direct evidence of discrimination or retaliation, plaintiff's claim must be analyzed under the *McDonnell Douglas*[41] burden-shifting approach.[42]   Under this approach,

---

[41] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[42] The Tenth Circuit applies the *McDonnell Douglas* burden-shifting analysis to Title VII retaliation claims.   *Miller v. Auto. Club of N.M. Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005).

the plaintiff must first establish a prima facie case of discrimination. The burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Once this is done, the presumption of discrimination established by the prima facie showing "simply drops out of the picture." The plaintiff then carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis . . . . The plaintiff may do so by showing that the proffered reason is pretextual.[43]

1.    Prima Facie Case of Discrimination

Plaintiff may establish a prima facie case of racial discrimination by presenting evidence establishing a genuine issue of fact "(1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently."[44] Here, it is undisputed that plaintiff is an African-American and is therefore a member of a racial minority. Defendant argues plaintiff cannot establish triable issues as to the second and third elements of his prima facie case. The court finds plaintiff has not established a prima facie case for the following reasons.

a.    Adverse Employment Action

Defendant asserts plaintiff did not suffer adverse employment action as a result of the two 2005 warning letters because plaintiff suffered no demotion, reduction in pay, or termination of employment. Additionally, defendant claims the letters cannot be considered

---

[43] *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124–25 (10th Cir. 2005) (citations omitted).

[44] *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

adverse employment actions because the letters expired nine months after their issuance. While Article 46 of the CBA reflects that defendant may not terminate or suspend an employee without an effective written notice on file, the written warning letters are placed and kept in the employee's personnel file.  Additionally, the more warning letters that are placed in the personnel folder, the more likely the employee is to be subject to harsher discipline, including termination.

The Tenth Circuit "liberally defines the phrase 'adverse employment action' but has not established a litmus test regarding what constitutes such an action."[45]  Obviously, decisions that materially alter the employment status of an employee constitute an adverse employment action.[46]  However, "[l]ess obvious actions may also constitute an adverse action and are judged on a 'case-by-case' basis to determine whether an identified employment action is truly adverse."[47]  In reviewing a similar issue regarding adverse employment actions, the Tenth Circuit stated:

> As to the written warnings, Roadway contends that they had no adverse effect on the terms and conditions of Roberts's employment because, after a nine month term of "validity," they could not be used to support disciplinary actions such as termination.  But the record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction.  This alone is enough to constitute adverse action.  *See . . . Berry*, 74 F.3d at 986 (holding that employer actions that "can have an adverse impact on future

---

[45] *Powers v. Tweco Prods., Inc.*, 206 F. Supp. 2d 1097, 1115 (D. Kan. 2002).
[46] *Id*.
[47] *Id*.

employment opportunities" are legitimately regarded as "adverse employment action[s]," and that in light of Title VII's remedial purposes, adverse employment action should not be defined narrowly).[48]

In *Medina v. Income Support Division, New Mexico*, the Tenth Circuit stated that "[d]isciplinary proceedings, such as warning letters and reprimands, can constitute an adverse employment action."[49]  The court noted that a warning letter "will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment—for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities."[50]  The court held the warning letter at issue fell short of an adverse employment action and noted the plaintiff had been offered other employment and resigned from the employer before the letter was issued, the letter was not placed in the plaintiff's personnel file, and that the plaintiff had not demonstrated that any subsequent employer could discover the letter in the future.[51]

Defendant relies on a case from the District of Kansas in which the court held several "write ups" did not constitute adverse employment actions.[52]  In that case, though, most of the write ups were kept in the supervisor's and leadman's desks and were not placed in the

---

[48] *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).
[49] 413 F.3d 1131, 1137 (10th Cir. 2005).
[50] *Id.*
[51] *Id.*
[52] *Robleado v. Deffenbaugh Indus., Inc.*, 136 F. Supp. 2d 1179, 1189-90 (D. Kan. 2001), *aff'd*, 33 F. App'x 480 (10th Cir. 2002).

plaintiff's personnel file.  The court held that those write ups did not constitute adverse employment actions.  Three other write ups, however, were placed in the plaintiff's personnel file.  The court noted that while the three write ups in plaintiff's personnel file may have constituted adverse employment actions, the court did not need to decide the issue because plaintiff failed to establish causation for his prima facie case of retaliation as to those three write ups.[53]

Defendant also relies on a case from the District of Kansas, decided well before *Medina* and *Roberts*, for the proposition that warning letters that expire or are rescinded do not constitute adverse employment actions.  The case, however, does not mention letters that expire but rather letters that are removed from one's personnel file.[54]

Here, it is undisputed that the two warning letters issued to plaintiff in 2005 are kept in his personnel file, even though they have expired pursuant to the CBA.  Although no evidence has been presented regarding whether a potential future employer could discover the letters, it is certainly plausible given that the letters remain in plaintiff's personnel file.  Additionally, plaintiff has presented some evidence, although fairly vague and non-specific, that defendant has based disciplinary action on  warning letters even after the nine-month period.  The letters do not contain an expiration date but do state that "[a]ny recurrence of this or similar type acts will result in further disciplinary action up to and including

---

[53] *Id.* at 1190 n.8.
[54] *Fortner v. Kansas*, 934 F. Supp. 1252, 1266-67 (D. Kan. 1996).

discharge." Therefore, considering the evidence in the light most favorable to plaintiff, the court finds the warning letters adversely affected the terms and conditions of plaintiff's employment and constitute adverse employment actions.

b.    Disparate Treatment of Similarly Situated Employees

Plaintiff argues that proof that similarly situated individuals are treated in a preferential manner is one way to meet the third element of his prima facie case but that it is not necessarily the only way. The court agrees.[55]  Plaintiff, however, fails to offer any other argument to meet the third element. Plaintiff's entire argument as to the third element states: "Being African-American he is up to 6.9 times more likely to receive such letters than similarly situated non-minority drivers."[56]  Indeed, plaintiff's argument appears to be that similarly situated non-minority drivers were treated in a preferential manner by not being issued letters at the same rate.

Similarly situated employees deal with the same supervisor and are subject to the same standards regarding performance evaluation and discipline.[57]  "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."[58]

---

[55] *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).
[56] Doc. 56, at 48.
[57] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).
[58] *Id.*

Plaintiff's 6.9 alleged rate of discipline was calculated based on eighteen drivers receiving warning letters for the same violation during the same general time period, fourteen of whom are Caucasian and four of whom are African-American.  Plaintiff also incorporates the fact that four percent of defendant's drivers are African-American and then assumes that the remaining ninety-six percent are non-minority.   Plaintiff's alleged statistical rate of discipline is discussed in more detail below in the context of whether he has shown pretext.

Plaintiff's statistics fail to show that *any* non-minority drivers dropped off the board for too long in the relevant time period but were not issued a warning letter.  Plaintiff also fails to show that the other non-disciplined drivers were similarly situated, such as they have the same supervisor or have similar work histories.  In short, plaintiff's 6.9 alleged rate of discipline does not show similarly situated non-minority drivers were treated in a preferential manner by not being issued warning letters for dropping off the board too long.

Plaintiff also has presented evidence regarding Caucasian drivers that were not disciplined for violating the same work rule by dropping off for a much longer period of time than did plaintiff.[59]  Plaintiff testified that in February 2006 a Caucasian driver and his non-

---

[59] The court ignores plaintiff's statements of fact that other drivers have dropped off the board as long or longer than plaintiff without being issued warning letters when those statements of fact fail to identify the drivers' race.  For example, Mr. Young testified that "[h]ell, guys dropping longer than that."  Doc. 56, ex. 3, at 15:20.  Ms. Giles testified that others took off the same amount of time and rarely get letters.  Doc. 56, ex. 1, at 45:5-13 & 76:17-24.  Ms. Giles was asked whether the teams that were not written up for taking excess hours were generally Caucasian drivers.  *Id.* at 45:23-25.   Neither party, however, has provided the court the page of Ms. Giles's deposition with her answer.  The court cannot determine that the other drivers Mr. Young and Ms. Giles discussed were similarly situated

African-American partner dropped five days after running less than 3000 miles.  The court

rejects plaintiff's testimony that the drivers told him the additional time was not authorized

by management as inadmissible hearsay.[60]  Plaintiff also has presented the deposition of

Mr. Young that he saw a Caucasian team drive one run and then take off extra time as if they

have driven 5000 to 6000 miles and not be disciplined.  Mr. Young testified he saw this

happen more than once, but he failed to remember any specific details.

Even construing the evidence in the light most favorable to plaintiff, the court finds

that plaintiff has not presented sufficient evidence that similarly situated drivers were treated

in a preferential manner.   Neither plaintiff's nor Mr. Young's example sufficiently

establishes the Caucasian drivers were similarly situated.   Plaintiff has not presented

evidence regarding the drivers' work histories or that they dealt with the same supervisor as

plaintiff. Further, Mr. Young's example lacks evidence of how long the drivers did run (i.e.,

it simply states that they made one run) or when the event occurred.  Further, plaintiff has

failed to present credible evidence that the drivers were unauthorized to take the additional

time off.  The court finds plaintiff has failed to meet the third element of his prima facie case

of discrimination by showing that similarly situated drivers were treated differently or

through any other evidence.

---

to plaintiff or that they were non-minority drivers.

[60] *See Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) (holding that Fed. R. Civ. P. 56 precludes the use of inadmissible hearsay testimony in depositions submitted in opposition to summary judgment).

2.      Prima Facie Case of Retaliation

To survive summary judgment on his retaliation claim, plaintiff must

> present evidence establishing a genuine issue of fact that (1) he
> engaged in protected opposition to statutorily prohibited
> discrimination; (2) he was subjected to an adverse employment
> action subsequent to or contemporaneous with his protected
> opposition; and (3) a causal connection exists between the
> employer's adverse employment action and the employee's
> protected activity.[61]

Defendant does not dispute that plaintiff participated in protected activity by filing EEOC

charges of discrimination.  Defendant argues that plaintiff cannot establish triable issues as

to the second and third elements of his prima facie retaliation case.  The court finds plaintiff

has not established a prima facie case for the following reasons.

a.      Adverse Employment Action Subsequent to or Contemporaneous with
        Protected Opposition

The court has already found that the warning letters constitute adverse employment

actions.  Plaintiff has shown the warning letters were issued after his first charge of

discrimination was filed with the EEOC in 2004.  The court therefore finds plaintiff was

subjected to an adverse employment action subsequent to his protected opposition in 2004.

b.      Causal Connection Between the Adverse Employment Action and the
        Protected Activity

In plaintiff's response to the instant motion, plaintiff merely states that a causal

---

[61] *Trujillo*, 157 F.3d at 1215 (10th Cir. 1998) (citing *Murray v. City of Sapulpa*, 45
F.3d 1417, 1420 (10th Cir. 1995)); *see also Annett v. Univ. of Kan*, 371 F.3d 1233, 1237
(10th Cir. 2004).

connection exists, but he provides no further explanation or argument.  Plaintiff simply states that for his May 30, 2006 charge, "[a] causal connection exists between the plaintiff's protected activity and the defendant disciplining African-Americans at a rate 6.9 times higher than Caucasians."[62]  Plaintiff fails to present any evidence of a causal connection between his protected activity and any adverse employment action against him.  Regardless, the court will address whether a causal connection exists.

The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[63]  However, "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."[64]  In *Meiners*, the court held that a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."[65]

While plaintiff filed a charge with the EEOC in 2004, almost a year passed before plaintiff was issued the warning letter in October of 2005.  This is insufficient to establish causation by temporal proximity.  Additionally, although plaintiff filed his second charge on

---

[62] Doc. 56, at 50.

[63] *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

[64] *Id.* (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)).

[65] *Meiners*, 359 F.3d at 1231.

May 30, 2006 and his third charge on November 26, 2007, he suffered no adverse employment action that he administratively exhausted contemporaneous with or after either charge. As a result, he must provide additional evidence beyond mere temporal proximity to establish a causal connection.

The only evidence that can be adduced from plaintiff's response is the statistical information regarding the issuance of warning letters. However, this is insufficient to prove a casual connection. Even if the statistical calculations were correct and reliable (which on the record presented is an awfully big assumption), they are still entirely unrelated to proving a causal connection between plaintiff's protected action and the adverse employment actions. Because plaintiff has failed to provide *any* evidence of a causal connection, the court grants defendant's motion for summary judgment on plaintiff's retaliation claim.

3.      Pretext

Although plaintiff has not established a prima facie case of discrimination or retaliation, the court will nevertheless briefly address the remaining *McDonnell Douglas* analysis. Defendant contends it issued plaintiff warning letters because he was dropping off the board and taking time off that he had not earned. Because defendant has articulated a legitimate, nondiscriminatory reason for its actions, the burden would then shift to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual or "unworthy of belief."[66]

---

[66] *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006).

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[67]  "This burden is not onerous . . . it is also not empty or perfunctory."[68]  Generally, a plaintiff makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e., unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[69]  More specifically, evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."[70]  "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment."[71]  Additionally, "'[i]f no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is

---

[67] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).
[68] *Id.* at 1323–24.
[69] *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).
[70] *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999).
[71] *Myers v. Colgate-Palmolive Co.*, 102 F. Supp. 2d 1208, 1217 (D. Kan. 2000) (citing *Hilti, Inc.*, 108 F.3d at 1323).

appropriate.'"[72]

Plaintiff fails to even argue that defendant's reason for disciplining him and issuing the warning letters was pretextual, let alone set forth any supporting evidence. The court, however, will address plaintiff's assertion that defendant disciplines African-Americans at a higher rate than Caucasians constitutes pretext in this case.[73]   Plaintiff has produced statistical evidence purportedly showing a correlation between race and discipline, i.e., that African-Americans were disciplined at a higher rate than Caucasians for dropping off the board.  Plaintiff—using the table defendant provided depicting the drivers that were issued warnings letters around the time plaintiff was issued his warning letters—concludes that because four of the eighteen drivers disciplined were African-American, and because African-Americans constitute four percent of the drivers employed by defendant, African-American drivers were disciplined at a rate 6.9 times higher than other drivers.

The court notes that the table of warning letters, on which plaintiff's 6.9 rate of discipline is based, is misleading because the time frame fails to encompass when plaintiff and Mr. Young were issued their second warning letters.  Although defendant provides

---

[72] *Id.* (quoting *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir. 1993), *overruled in part on other grounds*, *Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995)).

[73] Defendant argues that plaintiff has failed to authenticate Exhibit 13 as required by D. Kan. Rule 56.1(d).  Doc. 56, ex. 13.  While the court agrees plaintiff should have attached the original source of the information relied on in exhibit 13, plaintiff did provide citations to the original sources of information in paragraph 40.b. of his facts section.  Doc. 56, at 25.  Therefore, the court will consider the calculations.

information regarding who was disciplined two months before the first warning letter was issued, it fails to provide who else besides plaintiff and Mr. Young was disciplined when the second warning letter was issued, let alone two months after this second letter.  The table also fails to provide information regarding the issuance of warning letters from November 11, 2005 and November 17, 2005.

"While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question."[74]  "A plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."[75] "Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext."[76]  Additionally, "[s]tatistical evidence that does not adjust for the various performance evaluations and departmental rankings of the employees included in the statistical pool" is insufficient to establish pretext.[77]

> The probative value of statistical evidence varies greatly according to the type of discrimination alleged.  In a disparate impact case, statistical evidence plays a central role because the plaintiff is attempting to show a particular practice had a

---

[74] *Myers*, 102 F. Supp. 2d at 1218 (citing *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991)).

[75] *Id.* (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)).

[76] *Id.* at 1219 (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir. 1994)).

[77] *Sanders v. Sw. Bell Tel.*, 544 F.3d 1101, 1110 (10th Cir. 2008) (quoting *Pippin*, 440 F.3d at 1197–98).

> disproportionate impact on a particular group, and not the
> employer's discriminatory intent.  However, in an individual
> disparate treatment case, the focus is on how and why an
> employer treated a particular individual the way it did.  As such,
> statistical evidence of the employer's general hiring patterns is
> considerably less probative.   Moreover, because overall
> employment statistics have little bearing on the specific
> intentions of the employer in making particular hiring decisions,
> such statistical evidence will rarely suffice to rebut an
> employer's legitimate, nondiscriminatory reasons for a particular
> adverse employment action.[78]

Statistical evidence on its own will rarely suffice to show pretext.[79]  The court concludes that

plaintiff is not entitled to an inference of pretext for the following reasons.

Plaintiff's presentation of his statistical calculations is misleading.  First, as previously

mentioned, the table defendant provides is itself misleading regarding the time frame

represented.  Second, plaintiff's calculations simply assume that defendant's employees who

do not fit into the four percent African-American population are Caucasian, as opposed to

another racial minority.   Additionally, plaintiff fails to include evidence that the same

decision-maker was disciplining similarly situated employees.[80]  Most importantly, plaintiff's

statistical calculations in no way eliminate nondiscriminatory explanations for the alleged

disparate treatment.  Because plaintiff's statistical evidence fails to properly take into account

---

[78] *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1319 (10th Cir. 1999),
*overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

[79] *Ortiz v. Norton*, 254 F.3d 889, 897 (10th Cir. 2001).

[80] *See Myers*, 102 F. Supp. 2d at 1219 (indicating that the plaintiff's statistics were
flawed because they took into account persons terminated by decision-makers other than the
one who made the decision to terminate plaintiff).

nondiscriminatory explanations, he would not be entitled to an inference of pretext even if he had established prima facie cases of discrimination and retaliation.  The court finds the statistical calculations so flawed that they do not raise a jury question.

Plaintiff has failed to meet his burden to survive summary judgment.  He failed to exhaust his administrative remedies regarding the July 2006 accident and his other vague claims.  Plaintiff failed to meet his burden to establish prima facie cases of discrimination and retaliation as to the warning letters and, in any event, failed to show that defendant's nondiscriminatory reasons for its decisions were pretextual.  To show pretext, plaintiff must provide specific facts that prove defendant's reasons for the discipline were pretextual,[81] which plaintiff simply failed to do.  Plaintiff has not presented sufficient evidence to create a genuine issue of material fact, and defendant is entitled to judgment as a matter of law.

V.   Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.      Defendant's motion for summary judgment **(doc. 49)** is granted.

2.      This case is dismissed, with prejudice, with costs assessed against plaintiff.

Dated this 25th day of August, 2009, at Kansas City, Kansas.

  s/James P. O'Hara         <br>
James P. O'Hara<br>
U.S. Magistrate Judge

---

[81] *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).